STEVENSON v. NEW YORK CONTRACTING CO., PENNSYLVANIA TER-
MINAL.

(Supreme Court, Appellate Division, First Department. April 22, 1910.)

1. MASTER AND SERVANT (§ 278*)—SAFE APPLIANCES—PLACE OF ACCIDENT—
SUFFICIENCY OF EVIDENCE.

In an action for injuries to a railroad employé, caused by the negligent
slipping on a steep grade by reason of defective brakes, in which defend-
ant could be liable only if the accident occurred on the hill, evidence held
insufficient to sustain the burden on plaintiff to show that the accident
occurred on the hill.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

2. TRIAL (§ 312*)—JURY—INSTRUCTIONS—DUTY OF COURT.

Where the only theory on which defendant was liable for injuries to
a railroad employé was for furnishing defective brakes, and in that con-
nection the court charged that whoever does the duty incumbent on the
master represents the master, and the master is responsible for his acts,
and also charged that, when the accident occurred, the yardmaster who
at times gave switching orders was a fellow servant of plaintiff, it was
error not to instruct the jury, who, after they had retired, asked wheth-
er the company was responsible for orders from a person not acting in
his authorized capacity, namely, the yardmaster, since defendant was
not responsible for the yardmaster's acts or orders, as he had nothing to
do with the keeping in order of the engine.

[Ed. Note.—For other cases, see Trial, Dec. Dig. § 312.*]

3. APPEAL AND ERROR (§ 1069*)—PREJUDICIAL ERROR—FAILURE TO INSTRUCT
JURY AFTER RETIREMENT.

The action of the court in a negligence case in erroneously failing to
instruct the jury after retirement will be deemed prejudicial where
plaintiff was so deformed by the accident as to naturally arouse the sym-
pathy of the jury, and there was only slight evidence that defendant was
liable for the injury.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4136,
4138, 4139; Dec. Dig. § 1069.*]

Appeal from Trial Term, New York County.

Action by Patrick Stevenson against the New York Contracting
Company, Pennsylvania Terminal. From a judgment for plaintiff,
and from an order denying a motion for a new trial, defendant ap-
peals. Reversed.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE,.
SCOTT, and MILLER, JJ.

James A. Deering (Irving Paine, of counsel, and John Conway
Toole, on the brief), for appellant.

Thomas J. O'Neill (L. F. Fish, on the brief), for respondent.

CLARKE, J. The plaintiff was a brakeman on one of the construc-
tion trains operated by the defendant in its excavation for the new
terminal station of the Pennsylvania Railroad in the borough of Man-
hattan. While so employed he received such injuries as to fully justify
the verdict of $15,000, which he received, provided the defendant,
under the well-settled principles of law, was responsible therefor, and
of such a character as to excite the sympathy of the jury. Indeed, the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

recital thereof in the record on appeal presents so strong a picture of human suffering and deformity as to make the work of review most difficult. This fact in and of itself requires of this court a painstaking examination of the record to determine whether under the law as it now exists the plaintiff has established that the defendant is responsible for his deplorable condition.

The case is not within the employer's liability act (Consol. Laws, c. 31). The accident occurred on July 13, 1906. The site of the terminal began at Seventh avenue and extended west towards the North River. The excavation was carried on by blasting out the rock and handling it with steam shovels and cranes. The débris was transported by trains consisting of small dump and flat cars, pulled by steam engines on a narrow-gauge railroad over to the North River, where it was dumped into barges and carried away. From the main stem of this narrow-gauge road spurs and switches were laid down which were shifted from time to time as occasion required, so that the cars could be backed into a position where they could be conveniently filled by the steam shovels. East of Eighth avenue for a distance of some 50 yards the excavation had reached the permanent bottom grade. The ties were laid upon the rock to which the rails were attached. West of Eighth avenue the road ran upon a grade sloping up towards the west, was carried on a trestle, and so on to the North River. It is the contention of the plaintiff that in the 1,000 feet of the upgrade to the west the road rose 90 feet. The engine of the train upon which the plaintiff was at work weighed 18 tons, was propelled by steam, was furnished with brakes upon all its drivers, and had no tender. There were seven or nine flat and dump cars attached. These cars had no brakes. The plaintiff had been employed for 17 nights as brakeman at the time of the accident, going to work at 7 in the evening. The train made about one round trip an hour. When taking the loaded cars to the North River, the engine was to the west of its cars; that is, pulling them. In coming east it pushed the cars. The switches were laid upon the level ground east of Eighth avenue, and upon those switches the train would push or kick such empty cars as the yardmaster directed. The customary place of the plaintiff was in the end car, where he gave signals to the engineer as directed by the yardmaster, and it was also his duty when directed to uncouple the cars by pulling out the coupling pin, although it was in evidence that the yardmaster also performed this duty. On the night of the accident the train had been backed toward the east from the North River to the trestle at the coal and water station where it lay during the dinner hour, from 12 midnight to 1 a. m. After the whistle blew at 1 o'clock, it proceeded east for the purpose of distributing the empty cars upon the appropriate switches for the purpose of being reloaded.

The plaintiff's claim is this: That the brakes on the engine were loose and out of order; that for five or six days before the accident the plaintiff had seen that they waggled or wobbled; that the train coming back empty from the west pushed by this engine stopped on the grade of the hill; that Sweeny, the yardmaster, ordered the plaintiff to cut off two cars; that the train had stopped about a minute;

that plaintiff got down from his car, went between the second and third cars from the end, and pulled the coupling pin; that as he did so the train, by reason of the faulty brakes, of its own motion slid down the hill five or six feet, knocked him down, and caused the injuries complained of. His right to recover depends upon establishing these propositions: First, that the engine brakes were out of order and would not hold the train if stopped on the incline; second, that the train at the time of the accident had come to a stop on the incline; third, that after it had stopped on the incline and he had gone between the cars, as ordered, to pull the coupling pin, the train, by reason of its imperfect brakes and the incline suddenly slid down a few feet sua sponte. The absolutely essential element is that the train was on the incline at the time of the accident. If it was not, there is an end to the case. If the accident occurred in any other way, the defendant is not responsible. If Sweeny gave a signal to start too soon, if the engineer moved the train with or without orders, the plaintiff must fail. They were fellow servants concededly. The defendant's counsel said to the court as follows:

"So that there may not be any misunderstanding about the question of fellow servant, I want to renew this one request and get it in form. I ask the court to charge, first, that all of the witnesses in this case are fellow servants—all the parties who have appeared here except the doctor.
"Plaintiff's Counsel: In a sense they are.
"The Court: Yes; in a sense they are.
"Defendant's Counsel: I ask the court to charge that as a matter of right.
"The Court: I charge they are fellow servants.
"Defendant's Counsel: Now, I ask the court to charge that if the injury to the plaintiff resulted from the negligent giving of a signal by Sweeny, on the negligent starting of the train by the engineer, that then the plaintiff cannot recover.
"The Court: I charge that."

So it becomes necessary to examine the record to see if plaintiff successfully bore the burden of proving that the train had stopped on the incline.

The only testimony for the plaintiff was given by himself:

"On the night of this accident I was a brakeman on the train. Nine empty cars were on the train. They were being pushed towards the east by the engine which was on the west side. Q. While you were there on this train, did the train stop? A. It stopped. Q. What did anybody say to you? A. 'Get off and take two cars off.' The yardmaster, Sweeny, said that to me. * * * I took the pin out, and the moment I took the pin out the cars came down the hill, and dragged me. Q. How did you take out the pin? A. Stooping down, pulling the pin out, and that is all I know. I took the pin out and the train backed up on me, and I went that way (illustrating), and that is all I know. My head and arm went underneath the wheel."

Cross-examination:

"The cut in which I was working at that time where they were taking out the rock was east of Eighth avenue. * * * In getting over to the river we ran along the flat part of the excavation first. Then we went up the hill. * * * So we would start our loaded trains down on the flat and run up, and then up this incline and up onto the trestle. * * * I came over from the river, as I was doing when I was hurt. I was on the front end of the train really. They were backing us over. I came from the river from Thirty-Second street and North River, and back east along the trestle and down

the incline to Eighth avenue. The accident happened a little east of Eighth avenue. I cannot say whether at the point where the accident happened there was some switches that led out from the main track or not. I could not answer that question whether they were or not at all. Q. Don't you know whether there were some switches there? A. I could not answer at all. Q. Why not? A. Because I do not remember it. Q. Well, you remember that there were switches? A. There were switches there, so that cars could run to derricks and shovels, but I could not place where they were. There were switches which led out one to the north and some to the south from the main track. I know that. The purpose of those switches was to run the empty cars out to be loaded, out on these switches there would be a steam shovel, on some of them, loading stone into empty cars, and some of them had derricks loading big pieces in. When we would bring our empty cars over, the yardmaster would tell me where to put them on these different tracks. When we got over to Eighth avenue there, I would stop and wait until the yardmaster told me where to run our cars. I would stop them before I came to these switches. The yardmaster would tell me what to do. The yardmaster told me to cut off two cars; that is, the cars to the east of my train, two last cars. After the yardmaster told me to do that, the train stopped. I cut the two cars off, and all I know I went back (illustrating). The train stopped before it got to the switch. I was told to go in and uncouple the two cars. Sweeny told me to take off the two last cars. He did not tell me what to do with them. All I know when I was pulling the two last cars I went back. I do not think he told me what to do with them. I remember just what he said to me, 'Pull off two cars.' That meant to put them onto a side track. I did not have to put them on, just leave them there. Q. How did you get by them after you had left them? A. Towards Tenth avenue. I mean I was going to leave these two cars there, and my train was going west again, always did it that way, didn't back at all, didn't get a chance. The moment I pulled the two cars I fell back. The train backed up on me. When I went between the two cars to uncouple them my cars were standing down the hill, I could not answer what track they were on. I do not know it. I could not say whether they were on the main track or not. I could not get a chance to do anything, no more than I went to pull the pin and the car backed on me and I went (illustrating). I could not get a chance to do anything. Q. You came over from the river with a train of nine empty cars? A. Nine empty cars; yes, sir. Q. And you backed those to some place and then stopped? A. And then stopped. Q. I want to know where the two east cars of your train were when you stopped, * * * on what side were they? A. That is a question I cannot answer. Q. You told me a moment ago that, as soon as the cars were uncoupled, your train was going to go to the west and leave those cars? A. Going, and I got felled when I went to pull them. * * * Q. On what track were you going to leave these two cars that you cut off? A. I do not know. Q. Were you going to leave them on the main track? A. I cannot answer. I do not know. It was customary to leave cars which I cut off my train on the main track. What was done with them after that I do not know. * * * When Sweeny told me to cut off the cars, I was on the last car. The train was standing still at that time. I got down off the train, and I wanted to take off the two cars, and the train backed on me and dragged me. I went in between the cars. In order to uncouple them, I had to pull one pin. I just had it pulled and it backed. I was thrown down between the cars. I could not say how long I was between the cars. I did nothing else after I got down off the car except to get right between these two cars and start to pull out the pin. Just went to pull out the pin. I had my lantern. * * * The engineer was on the train and the fireman also. At the time I went in between the cars the engine was standing still. It had been standing still not quite a minute, and I pulled the pin. It stood still about a minute, I think. I think the engine as it stood there was west of the Eighth avenue trestle."

It will be seen that he does not clearly indicate the locus in quo. On the other hand, it is clear that there was a level space east of Eighth avenue, and that on this level space the switch was located.

The engineer testified positively that he got a lamp signal from Sweeny to disconnect one or two cars; that "to get rid of these cars, I first stepped down under Eighth avenue." "At the time I got rid of these two cars, no part of my train was on the hill. This switch is not on the hill. I kicked or backed these two cars in." "The pin was pulled after I got them in on the siding by Sweeny," and after that he got a signal from Sweeny to go west. "After I went towards the west, the brakeman in the car, I do not know whether he jumped out or whether he fell out, but he disappeared, and Sweeny he gave me a stop signal and called me to stop." "I stopped and threw the reverse lever over; the train came to a full stop. Then he gave me the signal to stop, and I backed * * * possibly a foot or two, * * * and stopped." He then ran back and found that Sweeny had pulled the plaintiff out from under and between the cars. "The place where my engine and train was standing at the time when this accident occurred and when this movement of 10 feet was made was not on the grade or on the rise at all. It was down on the flat itself."

Sweeny, the yardmaster, testified that he had himself pulled the coupling pin, and that he saw the plaintiff fall between the cars as he was getting down off the car; that the car was not on the hill or the grade at the time of the accident. "That was on the level .* * * at that point. There was no grade there. ' * * * We were just switching cars there. * * * He did not cut off no cars on the train that night. I did. I put them on the siding from off the main tracks."

Flannery, the switchman, was throwing switches. "Mr. Sweeny was pulling him out just as I seen him. Q. With respect to the cars, where was Stevenson at that time? A. Well, I should say he was about in between the second and third car on the north rail. Q. That is counting from the east, he was back a couple of cars? A. From the east; yes. * * * Right where the accident happened there is a kind of level, and right above it it starts in kind of an incline. The incline starts right above. The engine you may say was on the level and so was the car, but a little above that, about 15 yards above the engine, the incline starts to rise, but right there it is kind of level." "Right exactly where the train laid it was level, and no grade at all where the train laid, but right above it there was a grade."

McAndrews, who knew nothing of the accident, testified as to the lay of the land:

"My recollection is that east of Eighth avenue there was a level space of about 50 yards. Then it started to go up a little steeper."

Here are three eyewitnesses who place the locus in quo on the level and the accident occurring during the switching and two who saw the plaintiff fall from the car while in motion. The defendant's liability is predicated entirely upon negligent performance of the master's duty to furnish safe tools and machines, to wit, an engine; the specific defect claimed being a defective brake. The learned court in its charge gave a correct abstract definition of the master's duty to provide for the use of the servant appliances which are reasonably sufficient and apt and suitable for the work the servant is to do. He also charged:

"But whoever does the duty which the law makes incumbent upon a master does it in the master's place and stead, and the master is responsible for the manner in which it is done, and that responsibility he cannot escape."

After the jury had retired to consider their verdict, it sent the following question to the court:

"The jury asks an opinion of the court. Is the company liable for an act causing the accident by a man employed by the company not acting in the capacity which he is not authorized to do, and if his orders are a responsibility of company—that is, the yardmaster?"

Defendant requested that the jury be instructed as requested. The court said:

"I cannot answer that question. I will leave it to the jury on the instructions already given."

An exception was taken. The question was not well put, but it seems to us clear that the jury desired to be instructed whether the defendant was responsible for the result of Sweeny's orders. The court had specifically charged that Sweeny and the engineer were fellow servants with the plaintiff, and that, if the train had been started by the negligent act of either of them, plaintiff could not recover. But it had also charged:

"To whoever the master says 'Do my duty,' it does not make any difference whether you call him a scullion or a superintendent, in doing that duty he represents the master, and the master stands responsible for his acts."

It is evident that the lay members of the jury were confused and desired enlightenment. Under the facts of the case, the defendant was not responsible for Sweeny's acts or orders. He had nothing to do with the performance of the particular master's duty, to wit, the furnishing and keeping in good order of a suitable engine, which the court had in mind when it made the charge quoted. The jury should have been recalled and instructed upon the particular subject they were so much in doubt about that they had sent an inquiry to the court. In view of the natural sympathy aroused by the plaintiff's condition as exhibited to the jury, the slight testimony as to the place of the accident, and the condition of the engine, we cannot say that defendant took no harm from the refusal of the court to enlighten the jury. We think the plaintiff has not made out a case; that he has failed to show by a fair preponderance of evidence that the accident occurred as he claims; and that the verdict is against the weight of evidence.

It follows that the judgment and order appealed from should be reversed, with costs to the appellant to abide the event. All concur.